UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT W. CRONIN,

                Plaintiff,

v.                            Case No. 3:17-cv-1283-J-39JBT

JULIE L. JONES, SECRETARY,
FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

                Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Robert Cronin, an inmate of the Florida penal system, is proceeding on a pro se civil rights complaint (Doc. 1; Compl.) against the following Defendants: Mark S. Inch, Secretary of the Florida Department of Corrections (FDOC); Dr. Joey T. Kenney; and Dr. Errol A. Campbell. Plaintiff asserts Defendants were deliberately indifferent to his serious medical needs. Against the Secretary of the FDOC, Plaintiff also asserts state negligence claims. Before the Court are Defendants' separate motions for summary judgment: Dr. Kenney's motion (Doc. 137; Kenney Motion), with exhibits (Docs. 137-1 through 137-4; Kenney Ex. [1-4]); Dr. Campbell's motion (Doc. 144; Campbell Motion), with exhibits (Docs. 144-1 and 144-2; Campbell Ex. [A, B]); and Secretary Inch's motion (Doc. 146; Inch Motion).

Plaintiff has responded to each motion as follows: response to Dr. Kenney's motion (Doc. 148; Pl. Kenney Resp.), with exhibits (Docs. 148-1 through 148-15; Pl. Kenney Resp. Ex. [A-O]); response to Secretary Inch's motion (Doc. 151; Pl. Inch Resp.), with exhibits (Docs. 151-1 through 151-10; Pl. Inch Resp. Ex. [A-J]); and response to Dr. Campbell's motion (Doc. 154; Pl. Campbell Resp.), with exhibits (Docs. 154-1 through 154-9; Pl. Campbell Resp. Ex. [A-I]).

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that

2

there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Plaintiff's Allegations[1]

Plaintiff's claims arise out of a slip-and-fall incident that occurred at Suwannee Correctional Institution-Annex (SCI) on November 12, 2015. See Compl. at 7-8. Plaintiff alleges he sustained an injury to his left shoulder/clavicle, which causes him "severe pain and [an] inability to lift [his] left arm beyond 45 [degrees]." Id. at 7. Plaintiff received emergency treatment both at SCI and at Shands Live Oak Hospital (Shands). Id. at 7-8. In 2016, Centurion approved an orthopedic consult. Id. at 9. The orthopedist recommended surgery, which Centurion (through Dr. Campbell) denied, allegedly for cost-saving reasons. Id. at 9-10. Plaintiff seeks injunctive relief (medical treatment) and compensatory damages. Id. at 7.

### IV. Analysis & Conclusions

#### A. Dr. Kenney's Motion

Dr. Kenney first asserts, as he did in his motion to dismiss, that he is not a state actor subject to liability under 42 U.S.C. § 1983. See Kenney Motion at 2, 7. In the alternative, Dr. Kenney argues the evidence does not support a finding of deliberate indifference. Id. at 2, 12.

---

[1] Plaintiff's allegations are fully set forth in this Court's January 9, 2019 Order (Doc. 90).

Deliberate indifference to an inmate's serious medical needs constitutes the unnecessary and wanton infliction of pain, which the Eighth Amendment proscribes. Estelle v. Gamble, 429 U.S. 97, 104 (1976). However, run-of-the-mill medical malpractice actions do not give rise to constitutional claims simply because the plaintiff is a prisoner. Id. In other words, even though prisoners are at the mercy of corrections officials for medical care, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id. at 106. In fact, the Supreme Court has long recognized, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Id.

Disputes regarding the adequacy of medical care a prisoner has received, including diagnostic testing, sound in tort law. Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985). Consequently, "[w]here a prisoner has received . . . medical attention . . . federal courts are generally reluctant to second guess medical judgments and to constitutionalize [tort] claims." Id. (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (1st Cir. 1981) (alteration in original)). "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for

grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting Estelle, 429 U.S. at 107).

When a prisoner complains the medical care he received constitutes cruel and unusual punishment, he must demonstrate the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)). See also Owens v. Sec'y of Fla. Dep't of Corr., 812 F. App'x 861, 869 (11th Cir. 2020) (per curiam) (affirming the district court's grant of summary judgment in favor of a prison doctor who declined to order an x-ray, because the doctor's medical judgment, "even if it were incorrect or in conflict with another doctor's medical judgment," was not a constitutional violation).

Dr. Kenney assumes for purposes of his motion that Plaintiff's shoulder injury constitutes a serious medical need. See Kenney Motion at 13. He argues, however, that he did not decline to treat Plaintiff's shoulder injury. As the attending emergency room physician at Shands on November 12, 2015, see Kenney Ex. 1 ¶ 2, Dr. Kenney examined Plaintiff and reviewed x-ray results, which a radiologist interpreted. See Kenney Ex. 4 at 1-2. Based on his physical examination and the x-ray results, Dr. Kenney diagnosed a left shoulder sprain. Id. at 1.

Neither Dr. Kenney's physical examination nor the radiology report showed a dislocation. Id.; Kenney Ex. 2 at 1; Kenney Ex. 1 ¶¶ 18, 33. The x-ray showed "postsurgical changes and remote deformity of the humeral head and shoulder joint with advanced degenerative disease." See Kenney Ex. 2 at 1.[2] Dr. Kenney administered pain medication and noted Plaintiff had "markedly improved after treatment." See Kenney Ex. 4 at 3. Dr. Kenney discharged Plaintiff with medications and the following caution: "[I]f the symptoms persist or worsen the patient needs to return immediately for re-evaluation." Id.

In his response to Plaintiff's interrogatories, Dr. Kenney summarized his treatment of Plaintiff as follows:

> [T]he medical record reflects that Dr. Kenney obtained a history, performed a physical exam, ordered medications and diagnostic testing, came to a diagnosis and discharged the patient from the emergency department with instructions for follow-up care, all of which was done within the standard of care of an emergency medicine physician.

Pl. Kenney Resp. Ex. O ¶ 6.

Plaintiff asserts the Shands emergency records are "largely inaccurate" because they were generated from a "boiler-plate" form and because subsequent x-rays showed he indeed had a dislocated

---

[2] Plaintiff has surgical scars on his left shoulder from a prior surgery. See Pl. Kenney Resp. at 13. The prison doctor, Alexis Figueroa, asserts, "Plaintiff's left clavicle deformity was present well before Plaintiff's slip and fall incident of November 11, 2015." See Campbell Ex. B ¶ 15.

shoulder. See Pl. Kenney Resp. at 5, 6. Even if true that Dr. Kenney misdiagnosed Plaintiff or incorrectly attributed his shoulder "deformity" to a pre-existing condition, such conduct amounts to negligence, not deliberate indifference. Plaintiff himself acknowledges Dr. Kenney misdiagnosed him. In his "slip-and-fall timeline," Plaintiff notes he asked the orthopedic surgeon, Dr. Kleinhands, why there had been "so much misdiagnosis." See Pl. Kenney Resp. Ex. A at 5. According to Plaintiff, Dr. Kleinhands responded, "You don't need a radiologist, you need an orthopedic surgeon." Id. See also Pl. Kenney Resp. Ex. J ¶ 6. As addressed above, a doctor's misdiagnosis or inadequate treatment protocol does not give rise to a constitutional claim under the Eighth Amendment simply because the plaintiff is a prisoner. See Hamm, 774 F.2d at 1575.

Notably, Dr. Kenney treated Plaintiff at the emergency room; he was not responsible for Plaintiff's long-term care. The discharge summary, which Plaintiff provides as an exhibit, highlights that distinction: "You should contact your follow-up physician as it is important that you let him or her check you and report any new or remaining problems since it is impossible to recognize and treat all elements of an injury or illness in a single emergency care center visit." See Pl. Kenney Resp. Ex. K at 3 (emphasis added).

After Plaintiff was discharged from Shands, he received treatment for his continued complaints of pain, which Plaintiff readily acknowledges. See Pl. Kenney Resp. at 13. See also Pl. Kenney Resp. Exs. J, M. The very next day, in fact, Plaintiff was seen at the prison infirmary, and the doctor ordered additional x-rays. See Campbell Ex. B ¶ 25(i).[3] Dr. Kenney was not responsible for the care Plaintiff received or requested after his release from Shands. Thus, even if a referral to an orthopedic surgeon was delayed, as Plaintiff asserts, see Pl. Kenney Resp. at 13, such delay is not attributable to Dr. Kenney.

In sum, assuming Dr. Kenney was a state actor when he treated Plaintiff, he carries his burden on summary judgment by showing the absence of a genuine issue of material fact regarding whether he was deliberately indifferent to Plaintiff's serious medical needs. And Plaintiff fails to show the care Dr. Kenney provided was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." See Harris, 941 F.2d at 1505. Accordingly, Dr. Kenney is entitled to summary judgment and due to be dismissed from this action.[4]

---

[3] Dr. Campbell's exbibit B is the declaration of Dr. Alexis Figueroa, the SCI doctor who treated Plaintiff.

[4] Given the Court finds Plaintiff fails to establish Dr. Kenney's conduct constitutes deliberate indifference, Dr. Kenney's argument that he was not a state actor is moot.

### B. Dr. Campbell's Motion

Dr. Campbell offers the declarations of Dr. John P. Lay, Jr. (Centurion's statewide medical director) and Dr. Alexis Figueroa (the prison doctor who treated Plaintiff) to demonstrate the absence of a genuine issue of material fact regarding whether Dr. Campbell was deliberately indifferent to Plaintiff's serious medical needs. See Campbell Exs. A, B. Dr. Campbell does not dispute that Dr. Kleinhands recommended surgery in July 2016. See Campbell Motion at 9. Dr. Campbell also does not dispute that surgery is the recommended treatment protocol for a patient diagnosed with a grade 3 AC joint separation, which Dr. Kleinhands diagnosed Plaintiff as having. Id. at 10. See also Campbell Ex. A ¶ 24(xxi); Campbell Ex. B ¶ 25(xii). However, Dr. Campbell argues, he did not have subjective knowledge of Dr. Kleinhands's diagnosis and, thus, his denial of the surgical request was medically appropriate. See Campbell Motion at 18.

Recognizing Plaintiff's surgery should have been approved, Dr. Campbell attributes the improper denial to clerical errors, not to deliberate indifference. Id. at 20. Both Drs. Lay and Figueroa aver clerical errors occurred in the Utilization Management (UM) process, which Centurion follows when outside medical treatment or consults are recommended for inmates. See Campbell Ex. A ¶¶ 11, 20-23; Campbell Ex. B ¶¶ 19-20, 25. Under the UM process, when an outside doctor recommends a procedure such

as surgery, the UM coordinator at the prison compiles supporting medical records and electronically sends those, along with the appropriate form (DC4-702), to the UM clinician, a Centurion employee (in this case, Dr. Campbell). See Campbell Ex. A ¶¶ 11-15; Campbell Ex. B ¶¶ 19-20. Both the outside doctor (the specialist) and the prison doctor complete portions of the DC4-702 form, with the specialist completing page two (the back of the form), and the prison doctor completing page one (the front of the form). See Campbell Ex. A ¶¶ 24(xiv), 28.

Dr. Campbell asserts the UM process failed in Plaintiff's case because the UM coordinator sent Dr. Campbell only page two of the DC4-702 form, not the first. Id. ¶¶ 20-21. Page two included only the specialist's recommendation (surgery), not the diagnosis (grade 3 AC joint separation), which Dr. Kleinhands wrote on page one of the form. Id. Dr. Campbell did not receive page one and, thus, did not see the diagnosis. It appears the UM coordinator sent only page two of the DC4-702 form because Dr. Kleinhands mistakenly completed both sides. Dr. Lay explains, "the procedure [that] is generally followed for completing a [DC4-702 form] is that the general clinician/physician on the grounds at the correctional institution must complete the first page . . . . Then the form goes to the specialist . . . . [who] must complete the second page." Id. ¶ 28. Dr. Lay concludes, "it was not unreasonable or outside of applicable procedures for the UM [coordinator] to

only include the second page of the [form]," nor was it unreasonable for Dr. Campbell to issue a decision even though the DC4-702 form was incomplete. Id. ¶¶ 29, 30.

Not only did Dr. Campbell not receive the page of the form that included Dr. Kleinhands's diagnosis, the medical records the UM coordinator sent with the incomplete DC4-702 form included a December 14, 2015 radiology report, which showed Plaintiff had a grade 2 AC joint separation, not a grade 3.[5] Id. ¶ 22. See also Campbell Ex. B ¶ 29. Thus, Dr. Lay explains:

> Based on the failure to include the first page of [the DC4-702 form] in the UM Request Packet, and the inclusion of the December 14, 2015, x-ray report finding that Plaintiff suffered from a [g]rade 2 AC [j]oint separation, Dr. Campbell reasonably concluded that Plaintiff suffered from a [g]rade 2 AC [j]oint separation, and thus concluded that the Plaintiff did not need surgery.

Campbell Ex. A ¶ 23. Drs. Lay and Figueroa aver Dr. Campbell reasonably denied the surgical recommendation based on the information he knew at the time. Id. ¶¶ 23, 25; Campbell Ex. B ¶ 30. However, they both assert a UM clinician's denial of a request for treatment "never means that the request is outright denied." See Campbell Ex. A ¶ 17; Campbell Ex. B ¶ 22. Instead, it means the UM clinician needs more information or recommends the same

---

[5] The DC4-702 form Dr. Kleinhands completed, which includes the grade 3 diagnosis, is dated July 18, 2016. See Campbell Ex. A at 33.

results can be achieved through different means as set forth in an alternative treatment plan (ATP). See Campbell Ex. A ¶¶ 17-19; Campbell Ex. B ¶¶ 22-24.

Based on the records Dr. Campbell received, he issued an ATP. In his ATP, Dr. Campbell acknowledged a grade 3 AC joint separation would necessitate surgical intervention, but he did not see evidence of such a diagnosis in the UM Request Packet the UM coordinator sent him:

> the patient has chronic AC [j]oint separation. Type I and II is [sic] managed nonoperatively. The Type III and IV is [sic] managed surgically. Orthopedist evaluation does not indicate type of AC joint separation. Request for site medical director to contact orthopedist to discuss case and the type of AC joint separation. Recommend use of sling, NSAIDs, and joint rest in the interim.

Campbell Ex. A at 35.

Dr. Figueroa avers he examined Plaintiff twice after Dr. Campbell denied the request for surgery. See Campbell Ex. B ¶ 25(xiv). Dr. Figueroa reviewed his medical notes from the second visit, which he summarizes in his declaration as follows:

> On December 20, 2016, I again personally examined the Plaintiff. I diagnosed the Plaintiff with chronic AC [j]oint separation. I noted in the medical records that I spoke with the Plaintiff about the ATP and plan of action. I also noted that at this moment there was no ADL (activity of daily living) limitation as well as no constant pain or discomfort. I noted that I discussed the case with Dr. Campbell. Based on the December 14, 2015, x-ray report of Plaintiff's left

13

> shoulder finding that Plaintiff was suffering
> from a [g]rade 2 AC [j]oint [s]eparation, it
> was determined that no surgery was necessary.

Id. Dr. Figueroa avers he was unable to relay to Dr. Campbell that

Dr. Kleinhands diagnosed a grade 3 AC joint separation because Dr.

Figueroa never learned of the diagnosis. Id. ¶¶ 31-34. According

to Dr. Figueroa, he did not review or see Dr. Kleinhands's

diagnosis. Id. ¶¶ 33, 34. Had Dr. Figueroa known of the diagnosis,

he avers, he "would have advised Dr. Campbell and would have taken

other actions to address the finding." Id. ¶ 34.

In response to Dr. Campbell's motion, Plaintiff maintains Dr.

Figueroa did indeed know of the grade 3 diagnosis. See Pl. Campbell

Resp. at 3. Plaintiff explains he reviewed his medical file,

obtained a copy of the July 2016 DC4-702 form, and brought it with

him to his December 20, 2016 appointment with Dr. Figueroa. Id.

Plaintiff contends he showed Dr. Figueroa the form, with the

diagnosis, and suggested the ATP was issued in error given the

form did indicate the type of joint separation. Id. at 3-4.

Plaintiff also contests Dr. Figueroa's assertion that he (Dr.

Figueroa) could not have relayed the proper diagnosis to Dr.

Campbell. Id. at 4. Plaintiff says, "Dr. Figueroa called Dr.

Campbell on the telephone . . . . [and] relayed the information

that [Plaintiff's] injury was a grade-3 separation." Id. According

to Plaintiff, Dr. Figueroa was unable to convince Dr. Campbell to

approve the surgery even though "Dr. Campbell was provided with

the information he sought on his 9/16/16 ATP." Id. at 7. Dr. Figueroa allegedly told Plaintiff Dr. Campbell said he "doesn't care about the orthopedist's grade-3 diagnosis." Id. at 4.

In support of his response, Plaintiff offers the following documentation: a "slip-and-fall timeline," in which he documents the incident and all care he subsequently requested and received; his own declarations and those of other inmates; FDOC records; medical records; and Dr. Campbell's responses to his discovery requests. In his timeline, which Plaintiff verifies under penalty of perjury is true and correct, Plaintiff says he reviewed Dr. Kleinhands's diagnosis with Dr. Figueroa on December 20, 2016. See Pl. Campbell Resp. Ex. A at 11; Pl. Campbell Resp. Ex. B at 2.

Dr. Figueroa and Plaintiff tell two different stories with respect to a legally significant fact—whether Dr. Campbell knew Dr. Kleinhands diagnosed an injury that, under Centurion's protocols, meant surgery was clinically indicated.[6] When two parties' stories conflict, neither of which is blatantly contradicted by indisputable evidence, a district court may not

---

[6] The parties dispute other relevant facts as well. For instance, Dr. Figueroa expressly denies having made disparaging comments about Centurion and Dr. Campbell in front of Plaintiff. Compare Compl. at 9-10, with Campbell Ex. B ¶ 10. Additionally, Plaintiff says he told Dr. Figueroa that his shoulder injury limited his activities of daily living, contrary to Dr. Figueroa's notes in his medical records. See Pl. Campbell Resp. at 9. See also Pl. Campbell Resp. Ex. A at 11; Pl. Campbell Resp. Ex. B at 15.

make credibility determinations in favor of one party over the other. See Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019) ("[S]tatements in [a plaintiff's] verified complaint, sworn response to [a] motion for summary judgment, and sworn affidavit attached to that response should [be] treated as testimony by the district court.").

There is no indisputable evidence contradicting Plaintiff's contention that he made Dr. Figueroa aware of the grade 3 diagnosis on December 20, 2016, and that Dr. Figueroa in turn informed Dr. Campbell of the diagnosis. Thus, the Court must credit Plaintiff's sworn statement. Accepting as true that Dr. Campbell learned of Dr. Kleinhands's diagnosis on December 20, 2016, but still declined to approve the surgical request for non-medical reasons, his conduct may constitute deliberate indifference. See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference."). Additionally, because this constitutional right was clearly established at the time of the incident, Dr. Campbell is not entitled to qualified immunity. See id.

Dr. Campbell also argues Plaintiff sustained only a de miminis injury because his shoulder deformity was present before his fall. See Campbell Motion at 24. An injury that requires an emergency

room visit and has been diagnosed as requiring surgical intervention cannot be said to be de minimis. The extent to which the November 12, 2015 fall exacerbated Plaintiff's pre-existing shoulder injury is a matter in dispute, not subject to resolution on a motion for summary judgment.

### C. Secretary Inch's Motion

Plaintiff pursues the following claims against Defendant Inch, as outlined in the Court's Order on Defendants' motions to dismiss (Doc. 90): (1) deliberate indifference to serious medical needs; (2) negligence (failure to ensure safe premises); and (3) medical negligence by FDOC's x-ray contractors and subcontractors who failed to accurately diagnose Plaintiff's injury. See Compl. at 14-15, 16, 17-18. Defendant Inch argues Plaintiff fails to offer evidence to substantiate his conclusory allegations. See Inch Motion at 3.

### i. Deliberate Indifference

Defendant Inch asserts the deliberate indifference claim is rebutted by Dr. Campbell's affidavits and medical records offered in support of his motion. Id. at 4. Specifically, Defendant Inch states "No [surgical] recommendation . . . by Dr. Kleinhands as alleged has ever been established or provided to the court," and Plaintiff only disagrees with the medical treatment provided. Id.

Defendant Inch's argument that no surgical recommendation has been established is overtly contradicted by the evidence: Dr.

Kleinhands indisputably recommended surgery on July 18, 2016, which Dr. Campbell even acknowledges. See Pl. Campbell Resp. Ex. E at 5-6; Campbell Motion at 9. Moreover, as addressed above, construing the facts in a light most favorable to Plaintiff, the evidence permits the reasonable inference Dr. Campbell denied the surgical request for non-medical reasons. Because Defendant Inch makes no other argument related to the deliberate indifference claim, the claim may proceed.

### ii. Negligence

Defendant Inch contends Plaintiff provides no evidence to support his negligence claim—that the FDOC breached its duty to provide a safe working and living environment for inmates. See Inch Motion at 4. Defendant Inch acknowledges Plaintiff offers affidavits of other inmates who witnessed his fall, but Inch says the affidavits are exactly the same, "too general to defeat summary judgment," and contain inadmissible hearsay. Id. at 4-5.

The Federal Rules of Civil Procedure provide, "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff offers the declarations of two inmates who were working in food service with him on the day he fell. See Pl. Inch Resp. Ex. D at 7-8, 9-10. Both inmates aver under penalty of perjury that they

18

have "knowledge of the matters" stated in their declarations because they witnessed Plaintiff's accident. Id. Accordingly, the declarations show the inmates have personal knowledge of the events and are competent to testify on such matters. Additionally, to the extent Plaintiff calls the inmates to testify at trial, their statements are capable of being reduced to admissible form. Thus, the Court will consider them.

Both inmates aver no "wet floors" signs were displayed warning that the floor had recently been mopped. Id. at 7, 9. Additionally, the inmates contend, the worker who was responsible for cleaning the floors was never told to use "wet floor" signs, and inmates working in the dining area are not "safety trained" even though they are all forced to sign forms indicating otherwise. Id.

In addition to the inmate declarations, Plaintiff offers Defendant Inch's response to Plaintiff's request for admissions, in which he admits "inmates, security and medical staff reported slip-and-falls in the [SCI] dining rooms prior to 11/12/15." Id. at 26, 31.[7] Considering the inmate declarations and Defendant

---

[7] Defendant Inch faults Plaintiff for not providing evidence of prior, similar incidents that would have put the institution on notice of a safety hazard. See Inch Motion at 5. In response, Plaintiff notes Defendant Inch objected to most of his discovery requests. See Pl. Inch Resp. at 9. As an example, Plaintiff asked Defendant Inch to disclose "[a] printed log of the recorded slip-and-fall injuries that occurred at [SCI] [f]ood [s]ervice / dining hall from 2010 through present." See Pl. Inch Resp. Ex. J at 3. Defendant Inch objected to the request as follows: "Objection—as the request is not proportionate to the efficacy of the request,

Inch's discovery responses, Plaintiff provides some evidence showing there remain genuine issues of material fact regarding whether officials were on notice of a safety hazard. As such, this claim may proceed.

### iii. Medical Negligence

Plaintiff alleges the FDOC's medical contractors or subcontractors Tech Care and Schryver Medical, LLC, were negligent in preparing radiation reports by "failing to correctly report" Plaintiff's injury and by not comparing the x-ray films to those taken previously. See Compl. at 18. Plaintiff alleges the radiology companies breached their duty of care to him, which caused his injury to worsen. Id. Defendant Inch argues Plaintiff provides no evidence to support his claim. See Inch Motion at 5.

Plaintiff provides radiology reports from before his November 2015 accident and after. See Pl. Inch Resp. Ex. E. According to Plaintiff, the radiologists should have obtained his 2011 x-ray results to compare to the x-rays taken in 2015 and 2016, and their failure to do so was negligent, especially considering one radiologist noted a "[c]omparison with prior radiographs, if available, would be beneficial." See Pl. Inch Resp. at 10-11. See also Pl. Inch Resp. Ex. E at 4.

---

it is overbroad encompassing over 9 years of incidents that no stated relationship to this cause of action." Id. at 5.

Accepting as true that the radiologists failed to obtain Plaintiff's previous x-ray films to compare to the 2015 and 2016 x-ray films, Plaintiff's claim for medical negligence fails. Under Florida law, a plaintiff must comply with rigorous presuit screening requirements before filing a claim for negligence "arising out of the rendering of . . . medical care or services." See Fla. Stat. § 766.106 (1)(a), (2)(a). See also J.B. v. Sacred Heart Hosp. of Pensacola, 635 So. 2d 945, 949 (Fla. 1994) ("[C]hapter 766's notice and presuit screening requirements apply to claims that 'aris[e] out of the rendering of, or the failure to render, medical care or services.'"). Plaintiff does not allege or otherwise show he complied with the presuit screening requirements. Additionally, Plaintiff offers no evidence showing the radiologists' failure to compare x-ray films caused the alleged misdiagnosis. Thus, Plaintiff's medical negligence claim is due to be dismissed.

Accordingly, it is now

**ORDERED:**

1.  Defendant Kenney's motion for summary judgment (Doc. 137) is **GRANTED.** Defendant Kenney is entitled to summary judgment as to the deliberate indifference claim against him. Judgment in favor of Defendant Kenney will be withheld pending adjudication of the action as a whole. See Fed. R. Civ. P. 54.

2.    Defendant Campbell's motion for summary judgment (Doc. 144) is **DENIED**.

3.    Defendant Inch's motion for summary judgment (Doc. 146) is **GRANTED in part** and **DENIED in part**.

4.    Plaintiff will need assistance of counsel to present his case at a settlement conference and, if the case does not settle, at pretrial conference and trial. Thus, this case is **REFERRED** to the Jacksonville Division Civil Pro Bono Appointment Program so the designated deputy clerk of the Court may seek counsel to represent Plaintiff.

**DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of September 2020.

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Robert W. Cronin
Counsel of Record